# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**C.W. by and through his**
**next friend Mary Doe,**
          Plaintiff,

**v.**                                   **Case No. 1:23-cv-368-CLM**

**STEVE SMITH, _et al._,**
          Defendants.

## <u>MEMORANDUM OPINION</u>

 This case is about football locker room hazing, turned assault. C.W. alleges that, as part of a long-standing initiation ritual, older members of the Piedmont High School football team exposed their genitals and tried but failed to insert a key in his anus when he was a freshman member of the team. (_See_ Doc. 38). C.W. quit the team and left Piedmont after the incidents and now sues his former football coach, Steve Smith ("Smith"), and the Piedmont City School District ("District"). (_See_ Doc. 38).

 This opinion stems from both Defendants' motions to dismiss C.W.'s Second Amended Complaint. (Docs. 40, 41). The court previously dismissed the federal claims in C.W.'s First Amended Complaint in part because C.W., a male, failed to plead facts that would prove his older male teammates tried to perform the 'keying' initiation ritual on him "on the basis of sex," as prohibited by Title IX. (Doc. 36). As the court put it:

> Notably, C.W. does not plead that he was bullied because he was male, either in his statement of facts, (doc. 26 at ¶¶ 9-52) or in Count 1, (doc. 26 at ¶¶ 53-59). C.W. does not even mention his sex or sexual orientation when describing himself; rather, he focuses on his age (15-year-old freshman) and relatively small size (130 pounds).
>
> In short, C.W. pleads that he was bullied based on his size and status as a freshman, not "on the basis of sex." _See_ 20

> U.S.C. § 1681(a). So while C.W. may have claims under other civil and criminal statutes, he has not pleaded a viable Title IX claim because he pleads no facts that would prove that Piedmont High players, coaches, and/or administrators were attempting to exclude C.W. from the football team because he was male.

(Doc. 36 at 9). The court gave C.W. the chance to amend his complaint to correct these deficiencies, if possible. (Doc. 37).

In his Second Amended Complaint, C.W. keeps the same counts and adds some new factual allegations. The court quotes them below, but generally, C.W. adds that he is a heterosexual male and that the players attempted to 'key' him to diminish his masculinity. He furthers adds that the older football players only try to key younger male football players— never female athletes—and thus keying occurs 'on the basis of sex.'

As explained below, C.W.'s newly-bolstered factual allegations still do not raise a reasonable inference that C.W. was harassed because he was male. C.W. pleads that he was bullied by older players because he was a 130-pound freshman and that Coach Smith and the District favored and protected older established players. But pro-senior, anti-freshman bias is not anti-***male*** bias—*i.e.*, the fact C.W. must prove. The court therefore **GRANTS** the District's Motion to Dismiss Count I of C.W.'s Second Amended Complaint, (doc. 40), and **GRANTS** Smith's Motion to Dismiss Count II of C.W.'s Second Amended Complaint, (doc. 41). The court **DECLINES** to exercise supplemental jurisdiction over C.W.'s two state-law claims (Counts III-IV against Smith).

## BACKGROUND

The court reuses the background section from its first Memorandum Opinion (doc. 36 at 2-4)—adding and highlighting facts C.W. added to his Second Amended Complaint. Because the court is reviewing a Rule 12 motion, the court assumes these facts are true. *See* FED. R. CIV. P. 12(b)(6); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (at the motion-to-dismiss stage, "the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true").

## A. Keying

C.W. says that, for many years, older Piedmont football players would force car or truck keys into younger players' anuses, then twist the key—an "initiation practice" the players called "keying" that "specifically targets young male freshm[e]n because of their sex and status as new football players." (*See* Doc. 38 at ¶¶ 15-16). "The keying ritual is exclusive to male students, particularly males who are new to both the High School and the football team." (Doc. 38 at ¶ 17). While C.W. is unsure when 'keying' younger players started, he is sure that at least one player each year has been keyed, and that the coaches and administrators knew about it. (*See* Doc. 38 at ¶¶ 18-20).

One keying incident in 2020 led to criminal assault charges against three students who keyed a younger player. (*See* Doc. 38 at ¶ 19). The victim sued the School District and head coach Steve Smith—*i.e.*, the defendants here. (*See* Doc. 38 at ¶ 20).

## B. Bullying C.W.

C.W. was 15 years old and in ninth grade when he joined the football team in August 2022. (*See* Doc. 38 at ¶¶ 26-27). The hazing and bullying started the same month. (*See* Doc. 38 at ¶ 28).

First, fellow football player "J.P. approached C.W. in the boy's locker room, took ahold of his arm, and pulled him over to T.C., who had his pants down and was exposing himself. The goal of this interaction was to force C.W. to look at T.C.'s private parts and call him 'gay' for looking to emasculate C.W. and make him feel less like a man than J.P. and generally to diminish his masculinity." (Doc. 38 at ¶¶ 29-30). This incident "made C.W. deeply uncomfortable and disturbed and would not have occurred but for his sex, male." (Doc. 38 at ¶ 30). "C.W. had previously disclosed to J.P. that he was not homosexual. J.P. intentionally engaged in this behavior to emasculate C.W. because he knew it would impact him as a straight male." (Doc. 38 at ¶ 31). After, "[t]he football players would also taunt [C.W.] and made him uncomfortable by slapping his butt as they walked by him in the locker room, and that another football player R.P. slapped his butt in a classroom as he walked away." (Doc. 38 at ¶ 48).

On August 19, 2022, "another football player, J.B., grabbed his chest inappropriately, around his nipple, and twisted his hand, another emasculating behavior." (Doc. 38 at ¶ 21).

Finally, a few weeks later, Coach Smith told C.W. and four other students to work out in the field house locker room while the rest of the team watched film elsewhere. (*See* Doc. 38 at ¶¶ 34-35). The five students were unsupervised in the locker room. (*See* Doc. 38 at ¶ 36). One of the older students, T.H., approached C.W. and asked if he felt bullied; when C.W. replied, "No," T.H. advised, "Well, that is too bad." (*See* Doc. 38 at ¶ 37).

The four students told C.W. about the 2020 keying incident, a ritual that "was only directed at male freshm[e]n football players." (*See* Doc. 38 at ¶ 38). One of the four students then stated to C.W., 'We are going to key you' with a handful of keys in his hand. (Doc. 26 at ¶ 38). C.W. responded, 'No, I am good on that' and "fearfully walked to another side of the locker room." (Doc. 38 at ¶ 39). C.W. recounts: "The involved students followed him and were talking amongst themselves about sexual assault they intended to subject C.W. to in an effort to scare and emasculate him due to his sex and sexual orientation." (Doc. 38 at ¶ 40). They then "surrounded him, preventing him from exiting the space and took offensive positions. K.W. was blocking the door and the student still had his keys in hand." (Doc. 38 at ¶ 42). "Because the students told him they were going hold him down to 'initiate' him by sexually assaulting him with keys to emasculate him, [C.W.] attempted to escape, and tackled K.W., who was blocking the door to get away." (Doc. 38 at ¶ 43). "In his attempt to remove himself from the potentially horrific situation, . . . C.W. was beaten up by the involved students, outnumbered four to one." (Doc. 38 at ¶ 44).

### C. C.W.'s injuries

C.W. sustained minor injuries during the altercation. (Doc. 38 at ¶ 45). He told two other students and his mother what happened, (*see* doc. 38 at ¶¶ 45-46), and C.W.'s mother filed a police report the same day, (doc. 38 at ¶ 46). The next morning, Piedmont High School Principal Adam

Clemons hosted a meeting with C.W., Coach Smith, and the four involved students, (doc. 26 at ¶ 47).

Fellow players made fun of C.W. because, not only did he "chicken out" of the ritual, but he also reported what occurred to staff. (Doc. 38 at ¶ 49). "For example, C.W. was called a 'snitch' by another member of the football [team,] F.A., and other players followed suit, calling [C.W.] emasculating names, such as 'pussy.'" (Doc. 38, ¶ 49). Coach Smith acted "as if the assault was no big deal" and insinuated C.W. was "taking it too seriously." (Doc. 38 at ¶ 51).

The Piedmont Police Department told C.W.'s mother that the four students faced a six-month "observation," and that police officers would act if it happened again. (*See* Doc. 38 at ¶ 54). C.W.'s mother characterized the outcome as "the involved students essentially receiving six months of unsupervised probation." (Doc. 38 at ¶ 54). Within a week, C.W.'s mother transferred her son to Spring Garden High School, which is in a neighboring district. (Doc. 38 at ¶ 56).

### D. The Lawsuit

C.W. sued the Piedmont City School District and Coach Smith. C.W. alleges that the District violated Title IX of the Education Amendments Act (Count I). C.W. alleges that Coach Smith violated 42 U.S.C. § 1983 ("§ 1983") and the Fourteenth Amendment (Count II) and committed two state common law torts (Counts III-IV). (Doc. 38 at 10-13).

### STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, 'the-defendant-unlawfully-harmed-me' accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.* Rule 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A complaint states a facially plausible claim for relief when the plaintiff pleads facts that permit a reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

## DISCUSSION

C.W. pleads four claims: the District violated Title IX (Count I); Coach Smith violated C.W.'s rights under 42 U.S.C. § 1983 and the Fourteenth Amendment's Equal Protection Clause (Count II); Coach Smith negligently breached his duties to C.W. under state law (Count III); and Coach Smith recklessly or wantonly breached his duties to C.W. under state law (Count IV). The court addresses them in that order.

### A. **Count I, School District**: Title IX

After some introductory language about Title IX, C.W. pleads the following allegation that the District violated Title IX:

> 62. As alleged supra, Defendant Piedmont City School District was on actual notice of students habit and practice of continuously and repeatedly harassing and sexually assaulting students. Defendant Piedmont City School District had the authority to initiate corrective action in response to the involved students sexual harassment, intimidation and assault of their fellow students or place other restrictions on involved students.
>
> 63. Defendant Piedmont City School District, through the knowledge and inaction of Smith, acted with deliberate indifference to their sufficient, actual notice of the involved students sexual harassment, intimidation and assault of fellow students.
>
> 64. As a direct and proximate result of Piedmont City School District's deliberate indifference, Plaintiff was assaulted which caused personal injury and severe emotional distress, and has been denied educational opportunities

> and access. Plaintiff C.W. has been transferred out of
> Piedmont High School [and] homeschooled as a result of
> this incident.

(Doc. 38 at ¶¶ 62-64). In short, C.W. alleges that the District knew about the keying ritual and did nothing about it, which allowed the attempted keying of C.W. (*i.e.*, the sex-based action) that resulted in C.W. being assaulted and injured, then leaving the Piedmont school district (*i.e.*, the denial of educational opportunities and access).

C.W.'s allegation fails to state a claim that entitles him to relief under Title IX because, assuming the pleaded facts are true, C.W. fails to raise a reasonable inference that he was hazed and injured "on the basis of sex," as that phrase was understood when Congress passed Title IX in 1972. Rather, C.W.'s facts support a reasonable inference that the senior players acted with anti-freshmen bias—not an anti-***male*** bias.

1. *The law:* Title IX of the Education Amendments Act says: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). By its plain language, Congress limited Title IX's scope to discrimination "on the basis of sex," which the Eleventh Circuit recently held to mean "biological sex." *See Adams by and through Kasper v. Sch. Bd. Of St. Johns Co.,* 57 F.4th 791, 815 (11th Cir. 2022) (en banc). That means, to plead a viable Title IX claim, C.W. must plead facts that would prove that the District denied C.W. an educational opportunity or otherwise discriminated against him because he was a biological male, rather than a biological female.

C.W. alleges that fellow male students (not the District) committed the sex-based acts. Congress did not discuss student–on–student harassment in Title IX. That said, the Supreme Court has held that students can sue school boards under Title IX for actions taken by their student peers—but only "where [school boards] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to

deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). So C.W. must prove two things: (1) C.W.'s teammates harassed him because he was male, and (2) the harassment was so "severe, pervasive, and objectively offensive," *id.*, that it deprived C.W. of his ability to enjoy opportunities or benefits at Piedmont High School. The court doesn't reach the second issue because C.W. fails the first.

2. *Anti-freshman bias*: As he did in his previous complaint, C.W. alleges that older football players keyed and otherwise hazed freshmen players as acts of initiation and discipline—not sexual gratification:

15. The practice of 'keying' players (sexually assaulting younger male players by forcing a car or truck key into a player's anus and twisting it) has been a long-standing practice in the Piedmont High School football program.

16. The longstanding history of this sexual assault, established a need for vigilance in "private" male locker room spaces in which students could be isolated and subjected to it, specifically surrounding freshman students due to it being an "initiation" practice, that specifically targets young male freshman because of their sex and status as a new football player.

17. Female students in sports programs at Piedmont High School are not subjected to sexual assault by keys by male football players. The "keying" ritual is exclusive to male students, particularly males who are new to both the High School and the football team. . . .

23. More specifically, Smith knew of the practice whereby football players would discipline their younger male teammates by sexually assaulting them but did nothing to stop it; thereby ratifying the practice.

24. In a conversation between Principal Adam Clemons and one of the involved students K.W., K.W. stated the

> following: "I've been told, if you do something wrong or tell on someone you can get keyed which is called the Piedmont Special. [Minor student] told me about it. I am sure you know what happened. This was in 8th grade. It still goes around. It is a drifting treat."
>
> 43. Because the students told him they were going hold him down to "initiate" him by sexually assaulting, him with keys to emasculate him, he attempted to escape and tackled K.W., who was blocking the door to get away.

(Doc. 38 at ¶¶ 15-17, 23-24) (highlights added). In each allegation, C.W. limits keying and similar hazing acts to the initiation of freshmen football players. No senior males who played football were hazed. No freshman males who didn't play football were hazed. No females played football, so they were not hazed. Only *freshmen joining the football team* were hazed. In fact, C.W. alleges that the older players told him that freshmen football players were the only target when they tried to key him:

> 38. The four involved students then explained the 2019 incident where an upperclassman held down another male student, and rectally sexually assaulted him with keys. This ritual, as explained to C.W. by his teammates, was only directed at male freshman football players. One of the four involved students then stated "we are going to key you" with a handful of 7 keys in his hand. . . .

(Doc. 38, ¶ 38) (highlight added).

As C.W. pleads it, one fact question determines whether senior football players hazed someone: Is he a freshman football player? If the answer is no; the older players would not try to key or similarly haze him—or her. For example, senior football players would not try to key a freshman tuba player, whether the tuba player is male or female.

As a result, C.W.'s pleaded facts create the reasonable inference that keying and similar acts of hazing occurred on the basis of the

student's status as a freshman football player, not on the basis of the student's biological sex. C.W. thus fails to plead a plausible claim of sex discrimination under Title IX because the older players' actions were "more likely explained by" anti-freshman bias and hazing that does not violate Title IX. *Iqbal*, 556 U.S. at 681; *see also Doe v. Samford Univ.*, 29 F.4th 675, 692 (11th Cir. 2022) (affirming dismissal of Title IX claims against university because the complaint pleaded "'more likely explanations' for the university's conduct, including inexperience, ineptitude, and sex-neutral pro-complainant bias").

3. *Anti-male bias*: In his Second Amended Complaint, C.W. adds that he is a heterosexual male and adds several allegations to tie the older players' actions to C.W.'s biological sex and his sexual preference. These allegations fall into three categories.

First, C.W. matter-of-factly says that older football players keyed or otherwise hazed C.W. and other freshmen football players "because of" or "due to" their male sex. (Doc. 38 at ¶¶ 16, 30, 58). But these statements are conclusory; C.W. must plead facts that raise a reasonable inference that the older players hazed and assaulted him because he is male. *See Doe*, 29 F.4th at 687-88. Merely saying that sex discrimination occurred is not enough.

Second, C.W. alleges that the older football players did not key or slap female athletes on the butt, thus raising the inference that the older players acted with a pro-female, anti-male bias. *See* (Doc. 38 at ¶ 17, 48, 56). As C.W. puts it: "If C.W. had not been a new male football player, but rather a female athlete on a different sports team, this incident would not have taken place, nor the subsequent transfer out of the school." (Doc. 38 at ¶ 56). The preceding factual allegations support C.W.'s conclusion that senior football players would not try to key a female volleyball or softball player, but they also support a more plausible, non-violative explanation: Football players did not key or assault female athletes because females don't play football or use the football locker room and thus do not subject themselves to football locker room initiation and discipline.[1] Again, older

---

[1] The regulations implementing Title IX explicitly permit schools to maintain "separate toilet, locker room, and shower facilities on the basis of sex[.]" *Adams*, 57 F.4th at 811

football players did not key freshmen males who did not play football. So even if you assume C.W.'s allegations are true, the male-female distinction does not explain why senior football players key or similarly haze freshman football players. Rather, C.W.'s "allegations permit obvious alternative explanations that suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer"—*i.e.*, older football players hazing freshmen football players. *Doe*, 29 F.4th at 689. Because the hazing of new football players—a sex-neutral motive—is "the likelier, more obvious explanation" for older football players not keying or assaulting female athletes (or male non-athletes), the football team's failure to haze or initiate female athletes does not raise a plausible allegation of sex discrimination.

Third, C.W. pleads that older players performed, simulated, or mentioned multiple sex-related acts to "emasculate" C.W. and other freshmen football players:

> 29. Alongside the August 25th, 2022 assault outlined below, J.P. approached C.W. in the boy's locker room, took ahold of his arm, and pulled him over to T.C., who had his pants down and was exposing himself.

> 30. The goal of this interaction was to force C.W. to look at T.C.'s private parts and call him "gay" for looking ==to emasculate C.W. and make him feel like less of a man than J.P. and generally to diminish his masculinity==. This interaction made C.W. deeply uncomfortable and disturbed and would not have occurred but for his sex, male.

> 31. C.W. had previously disclosed to J.P. that he was not homosexual. ==J.P. intentionally engaged in this behavior to emasculate C.W. because he knew it would impact him as a straight male==.

---

(quoting 34 C.F.R. § 106.33). So Title IX allows some differential treatment of the sexes in sports locker rooms. *See id.* at 817 (separating bathrooms based on biological sex does not violate Title IX).

32. Further, on August 19, 2022 another football player J.B. grabbed his chest inappropriately, around his nipple and twisted his hand, ==another emasculating behavior==. . . .

40. The involved students followed him and were talking amongst themselves loudly about the sexual assault they intended to subject C.W. to ==in an effort to scare and emasculate him due to his sex and sexual orientation==. 41. The boys spoke loudly about "gay sex" and how Plaintiff C.W. should not worry because they had "gay family members", one of the students specifically talking about their gay uncle.

42. As Plaintiff C.W. would not acknowledge them, the students surrounded him, preventing him from exiting the space and took offensive positions. K.W. was blocking the door and the student still had his keys in hand.

43. Because the students told him they were going hold him down to "initiate" him ==by sexually assaulting, him with keys to emasculate him==, he attempted to escape and tackled K.W., who was blocking the door to get away.

44. In his attempt to remove himself from the potentially horrific situation, Plaintiff C.W. was beaten up by the involved students, outnumbered four to one.

48. The football players also taunted C.W. and made him uncomfortable by slapping his butt as they walked by him in the locker room, and another football player R.P. slapped his butt in a classroom as he walked away. C.W. never saw any of the male football players slap females on the butt and ==they engaged in this behavior toward him to emasculate him because he is a heterosexual male==.

> 49. After the locker room incident, he was continually made
> fun of in that not only did he "chicken out" of the ritual,
> but also reported what occurred to staff. For example,
> C.W. was called a snitch by another member of the
> football player F.A., and ==other players followed suit==
> ==calling him emasculating names such as a "pussy".==

(Doc. 38 at ¶¶ 29-31) (highlights added). But these allegations do not raise a plausible claim of sex discrimination under Title IX, nor do they overcome the plausible, non-violative explanation for the older players' actions—*i.e.*, hazing freshmen.

Allegations that the older players acted in an offensive, sex-related manner (*e.g.*, slapping C.W.'s butt and twisting his nipple) do not themselves lead to a plausible allegation that they acted out of anti-male bias. As the Supreme Court put it when reading Title VII, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (ellipsis in original). The Fifth Circuit has made the same point about Title IX: "The offensive behavior . . . must still be based on sex, per the words of [T]itle IX, and 'not merely tinged with offensive sexual connotations.'" *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011). In other words, merely pleading that older football players talk and act in a sex-related manner with younger male teammates does not create a plausible Title IX claim, unless those acts are connected to the differential treatment of males and females.

Congress did not cover one man teasing another man about his level of masculinity when it wrote Title IX. As the en banc Eleventh Circuit noted, "'sex' is not a stereotype" in the Title IX context. *Adams*, 57 F.4th at 813. Rather, the phrase "on the basis of sex" focuses on the distinction between the biological sexes (male and female), not sexual orientation (*e.g.*, heterosexual, homosexual, bisexual) or gender identity (*e.g.*, transgender):

> To interpret "sex" within the meaning of Title IX, we look to the ordinary meaning of the word when it was enacted in 1972. One of the methods of determining the ordinary meaning of a word "is by looking at dictionaries in existence around the time of enactment." Reputable dictionary definitions of "sex" from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of "sex" in education, it meant biological sex, i.e., discrimination between males and females.

*See id.* at 812-15 (citations omitted) (highlight added). If differential treatment of a biological male who identifies as female does not trigger Title IX liability, then neither can differential treatment of a man because he is 'less masculine' than other men.

4. *The <u>Oncale</u> factors*: That C.W. fails to plead facts that create a plausible inference that the older players acted "on the basis of sex" under Title IX is bolstered by reference to the factors the Supreme Court has given to look for same-sex sexual harassment in the Title VII context:

- Was the bad actor motivated by sexual desire?
- Was the bad actor motivated by a general hostility against other members of the same sex being in the workplace?
- Is there direct comparator evidence of how the bad actor treated members of the opposing sexes in the workplace?

*Oncale,* 523 U.S. at 80-81. Using these factors, C.W. pleads no facts that suggest biological sex was a motivating factor in the senior players' acts or words. First, C.W. offers no facts that would prove the senior players sexually desired C.W. Second, C.W. offers no facts that would prove the senior players didn't want males on the football team. To the contrary, every player *was* male, so the team would not exist without them. Third, C.W. offers no evidence how the senior players treated freshman female football players because no females played on the football team.

5. *Contrary views*: Finally, the court recognizes that its sister courts have split on cases involving sex-related sports hazing. For example, a Pennsylvania District Court dismissed a Title IX claim brought by a

freshman college football player who claimed that upperclassmen would "simulate a humping action" and place their genitals in the face of freshman "as a form of initiation into the Penn State football program." *Humphries v. Pa. State Univ.*, 492 F. Supp. 3d 393 (M.D. Penn. 2020). Yet a Tennessee District Court ruled that a jury could decide a Title IX claim stemming from senior high school basketball players sodomizing two freshman basketball players with pool cues. *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543 (E.D. Tenn. 2018).

Despite the Supreme Court's warning that sex discrimination claims cannot "merely [be] tinged with offensive sexual connotations," *Oncale*, 523 U.S. at 81, some courts have ruled that orally challenging masculinity constitutes an act "on the basis of sex" under Title IX. For example, after acknowledging there was "no concrete evidence that any of the children at [a middle school] was harassing [the plaintiff] simply because he was male," an Indiana District Court allowed a Title IX claim that insults such as "gay" and "faggot" could have been hurled "on the basis of sex" "because [the plaintiff] was acting in a manner that did not adhere to the traditional male stereotypes." *Seiwart v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942 (S.D. Ind. 2007). Similarly, a Kansas District Court allowed a Title IX claim brought by a male high school student who was orally harassed by other male students "to disparage his perceived lack of masculinity." *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952 (D. Kansas 2005).[2]

---

[2] While the District's motion was pending, the United States Department of Education cited *Seiwart* and *Theno* in a final rule that will amend the regulations implementing Title IX to say that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related condititions, sexual orientation, and gender identity." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33516 (citing *Theno* and *Seiwart*), 33886 (adding § 106.10 to define the scope of "on the basis of sex") (to be codified at 34 C.F.R. pt. 106). The new regulation contradicts the Circuit Court's recent statement that "'sex' is not a stereotype" under Title IX. *Adams*, 57 F.4th at 813. This court defers to the Circuit Court's reading of Title IX, not the Department's. *See Loper Bright Enters. v. Raimondo*, 603 U.S. __ (2024) (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

That courts have come out on both sides is further reason to dismiss C.W.'s Title IX claim. Congress passed Title IX under its Spending Clause authority. U.S. CONST. art. I, § 8, cl. 1. The Supreme Court has said that "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That means that local school boards can be sued only if they "had adequate notice for the conduct at issue." *Davis*, 526 U.S. at 640.

Title IX did not unambiguously prohibit same-sex acts of sports hazing or speech that challenges masculinity in 2022. As explained, a plain reading of the statute and the recent en banc opinion in *Adams* suggests that it did not (and does not) cover cases like this. Because the District did not have adequate notice that it could be sued by a male football player for initiation and hazing acts taken by other male football players—even acts that may have crossed the line from hazing to criminal assault—the District is not subject to liability under Title IX.

Whether Title IX should be amended to equate same-sex, sexually-offensive hazing with discrimination based on sex "should be left to Congress—not the courts." *Adams*, 57 F.4th at 791. Congress has tried address such hazing but has failed so far. *See, e.g.*, Report and Educate About Campus Hazing Act, S. 744 & H.R. 2525 117 Congress (1st Session 2021). But 44 states *have* passed laws that target hazing. *See States with Anti-Hazing Laws*, STOPHAZING.ORG (July 5, 2024), www.stophazing.org/policy/state-laws. Alabama's hazing statute, for example, covers acts taken as part of an initiation onto a sports team that "recklessly or intentionally endangers the mental or physical health of any student," without mentioning sex. Ala. Code. § 16-1-23(1). The law requires that such incidents be reported, *see* Ala. Code § 16-1-23(3); provides criminal charges for those who haze or fail to report hazing, *see* Ala. Code § 16-1-23(4); and provides for the forfeiture of public funds and awards to any person or organization involved, *see* Ala. Code § 16-1-23(5).

That Congress and State legislatures saw the need to fill a gap in Title IX and other laws to cover cases like this further shows that the facts C.W. pleads do not raise a plausible claim that the senior players acted

"on the basis of sex," as that phrase was understood when Congress passed Title IX in 1972. It is not this court's role to fill that gap.

—

To sum up, C.W. pleads that the older football players' act of keying (doc. 38 at ¶ 38) was "exclusive to male students, particularly males who are new to both the High School and the football team" and "was only directed at male freshman football players," (doc. 38 at ¶ 17). These facts, plus the rest of C.W.'s pleaded facts, create the reasonable inference that the older football players acted based on C.W.'s status as a freshman football player, not C.W.'s biological sex. Because the older players' actions were more likely explained by anti-freshman bias, not anti-male bias, C.W. fails to plead a plausible claim of sex discrimination under Title IX. *Doe,* 29 F.4th at 692 (affirming dismissal of Title IX claims against university because the complaint pleaded "'more likely explanations' for the university's conduct, including inexperience, ineptitude, and sex-neutral pro-complainant bias"). The court will thus **GRANT** the District's Motion to Dismiss Count I against it.

### B. Count II, Coach Smith: § 1983

This is the entirety of Count II, in which C.W. pleads a § 1983 claim against Coach Smith:

> 65. Paragraphs 1 through 58 are incorporated herein as if set out in full.
>
> 66. Defendant Smith, individually and with final decision-making authority on behalf of the Piedmont City School District, violated Plaintiff's rights under 42 U.S.C. §1983 and his FOURTEENTH AMENDMENT EQUAL PROTECTION rights by failing to protect his from harassment, intimidation and sexual assault as Plaintiff was left alone and unprotected when he had actual notice of prior harassment via the 'keying' practice.

67. Defendant Smith acting or purporting to act under color of state law, intentionally and purposefully discriminated against Plaintiff depriving his of the rights guaranteed his by the EQUAL PROTECTION rights found in the FOURTEENTH AMENDMENT to the U.S. CONSTITUTION, and his rights under 42 U.S.C. § 1983.

68. Defendant Smith's actions violated Plaintiff's clearly-established legal rights and were performed with malice and/or done with reckless disregard to the Plaintiff's federally protected civil rights.

69. As a proximate consequence thereof, Plaintiff has been damaged as he has been caused to suffer physical injury, severe emotional distress, embarrassment, humiliation, anxiety, and concern.

70. Plaintiff is entitled to an award of compensatory and punitive damages against Defendant Smith in his individual capacities; that Defendant Smith actions were willful, wanton, and/or reckless or otherwise improper and egregious to a degree that it would require or otherwise substantiate the allowance of actual compensatory and punitive damages in an amount to be determined by the jury against Defendants.

(Doc. 38 at ¶¶ 65-70). The court quotes Count II in full because C.W. did not correct the deficiencies the court noted when dismissing the first iteration of this claim. So the court largely re-uses its previous analysis, starting with the governing law.

1. *The law*: Section 1983 creates liability for state employees who deprive others of their Constitutional rights or other federal rights:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. C.W. alleges that Smith is liable to C.W. because Smith "violated Plaintiff's rights under 42 U.S.C. §1983 and his FOURTEENTH AMENDMENT EQUAL PROTECTION rights by failing to protect [C.W.] from harassment, intimidation and sexual assault as [C.W.] was left alone and unprotected when [Smith] had actual notice of prior harassment via the 'keying' practice." (Doc. 38 at ¶ 66).

C.W. is right that § 1983 allows him to sue a public school teacher who violates his Fourteenth Amendment "right to be free from sex discrimination." *Hill v. Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979)); *see also Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) ("Appellees have a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment."). The Eleventh Circuit has held that "a governmental official . . . may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Hill*, 797 F.3d at 978 (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999)); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300–02 (11th Cir. 2007) (discussing government officials' liability under section 1983 arising from "right to be free from sex discrimination"); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (applying "deliberate indifference" standard for section 1983 deprivation of constitutional right to be free from sexual harassment). But "[i]n order to prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must prove the individual defendant 'actually knew of and acquiesced in' the discriminatory conduct." *Hill*, 797 F.3d at 978 (citing *Murrell*, 186 F.3d at 1250).

2. *Discussion*: Count II fails to state a claim that entitles C.W. to relief for the same two reasons the court previously noted. (Doc. 36). First, C.W. fails to allege a violation of the Equal Protection Clause. To prove that Smith violated his equal protection right, C.W. must prove both that (1) Smith treated other similarly situated persons better than C.W. and (2) Smith treated C.W. worse than his comparators because of a constitutionally protected interest like race or sex. *See Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001). But C.W. fails to plead what protected interest C.W. possessed and Smith targeted. Because the rest of the complaint alleges that C.W. was harassed on the basis of sex, the court must assume that sex is the protected characteristic.[3] But as explained in Part A, C.W. does not plead any facts that would prove C.W. was bullied or assaulted because he is male. *See supra* § A. Nor does C.W. plead facts that would prove that Smith treated him differently (or failed to protect C.W.) because he is male. Again, the football team is made up of males, including the four older males who C.W. alleges Smith was protecting. If C.W. proved that Smith protected some males to the detriment of other males, then no factfinder could determine that 'being male' was the reason Smith chose some players over others.

Second, C.W. fails to plead facts that would prove Smith knew about or acquiesced in the bullying and attempted keying of C.W. While a government official like a football coach "may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment . . . [i]n order to prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must prove the individual defendant 'actually knew of and acquiesced in' the discriminatory conduct." *Hill*, 797 F.3d at 978 (internal citations omitted). C.W. pleads no facts that would allow a fact finder to determine that Smith "actually knew of and acquiesced in" the players' treatment of C.W. C.W. pleads that Smith was his coach only "for a short period at Piedmont High School," (doc. 38 at ¶ 13); that is, a few weeks in August 2022. C.W. does not plead that Smith knew about the alleged bullying that preceded the attempted keying on August 25, 2022. As for that incident, while C.W. pleads that Smith told the players to work out in the locker room, he does not plead that Smith

---

[3] C.W. does not plead his race.

knew or should have known the players would bully or assault C.W. while there beyond an allegation that "Smith knew a young male student had been sexually assaulted with keys in the locker room in 2020 when he left some of the older football players in the locker room with newer male players unsupervised." (Doc. 38 at ¶ 22). C.W. pleads that he did not tell Smith about the assault on the day it happened. (*See* Doc. 38 at ¶ 45). Rather, C.W. told Smith in the principal's office the next day, and in response, Smith and the principal called the involved students to discuss the incident. (Doc. 38 at ¶ 47).

As the court stated last time, while C.W. has pleaded facts that, if true, would prove Smith was indifferent to hazing generally and insensitive to C.W. particularly after Smith learned about the keying incident, C.W. does not plead any facts that would prove Smith "'actually knew of and acquiesced in' the discriminatory conduct." *Hill*, 797 F.3d at 978. While C.W. couches Smith's actions as deliberately indifferent, "[t]he Supreme Court has noted the 'deliberate indifference' standard under § 1983 is a 'stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' A court must 'carefully test the link between the policymaker's inadequate decision and the particular injury alleged.' The evidence must show the deprivation of the constitutional right is a 'plainly obvious consequence' of the municipal action.'" *Id.* at 977 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410-11 (1997)). Even if you consider Smith's decision to leave a freshman football player unsupervised in the locker room based on prior keying incidents, C.W. pleads no facts that meet the "stringent standard" of proving that the assault on C.W. was "a known or obvious consequence" or a "plainly obvious consequence" of leaving C.W. with other players to work out unsupervised. *See id*.

3. *Qualified immunity*: Based on the court's ruling above, the court also finds that Smith is entitled to qualified immunity. The Eleventh Circuit has explained qualified immunity like this:

> Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

> of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). For qualified immunity to apply, a government official must initially establish that he was acting within his discretionary authority when the alleged wrongful acts occurred. *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). 'Once it has been determined that an official was acting with the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate.' *Id.* 'First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right." *Id.* 'Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct.' *Id.*

*Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022).

C.W. pleads that Smith "acted under color of state authority" at all relevant times. (Doc. 38 at ¶ 12). That means, to avoid Smith's claim of qualified immunity, C.W. had to plead facts that would prove both (a) that Smith violated a constitutionally protected right and (b) that right was clearly established when C.W. was bullied and assaulted.

As mentioned, C.W. pleads that Smith violated his "Fourteenth Amendment Equal Protection rights by failing to protect [C.W.] from harassment, intimidation and sexual assault as [C.W.] was left alone and unprotected when [Smith] had actual notice of prior harassment via the 'keying' practice." (Doc. 38 at ¶ 66). But, as explained, the Equal Protection Clause does not provide a *general* right against harassment or assault; it provides a right against being treated differently because of a protected characteristics like race or sex. *See Jones*, 279 F.3d at 946-47. C.W. pleads no facts that would prove such unequal protection, so he cannot meet the first requirement of proving the violation of a constitutionally protected right. *See id.* Further, even if courts extend the

Fourteenth Amendment to facts like these—*i.e.*, protection against older male football players hazing and assaulting their younger male teammates—that right was not clearly established when these events happened in August 2022.

### C. Counts III-IV, Smith: Negligence, Recklessness, Wantonness

C.W. invoked the court's subject matter jurisdiction by pleading the two federal claims that the court has explained are inadequately pleaded. *See supra* §§ A-B; 28 U.S.C. § 1331. C.W. pleads his other two claims against Smith under Alabama's common law of negligence (Count III) and recklessness or wantonness (Count IV).

Section 1367(c)(3) says that the court may decline to exercise supplemental jurisdiction over C.W.'s state-law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Principles of federalism suggest that state courts should decide matters of state law if possible. So the court will not rule on the merits of C.W.'s state-law claims because he cannot plead a viable federal law claim.

### CONCLUSION

For these reasons, the court **GRANTS** the District's Motion to Dismiss Count I of C.W.'s Second Amended Complaint, (doc. 40), and **GRANTS** Smith's Motion to Dismiss Count II of C.W.'s Second Amended Complaint, (doc. 41). The court **DECLINES** to rule on C.W.'s state-law claims, Count III and Count IV, (doc. 38), in the absence of a federal claim.

Because the court previously gave C.W. the chance to amend his complaint to address the deficiencies noted above, the court will dismiss Counts I-II **with prejudice.** The court will enter a separate order that carries out this ruling.

**DONE** and **ORDERED** on July 8, 2024

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE